UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY HARRISON BAXTER,<br><br>Petitioner,<br><br>v.<br><br>CHRISTIAN PFEIFFER, Warden,<br><br>Respondent. | No.  2:21-cv-1268 DAD AC<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the original petition, ECF No. 1, which challenges petitioner's 2018 conviction for two counts of first degree murder. Respondent has answered.  ECF No. 26.  Petitioner did not file a traverse.

BACKGROUND

I.     Proceedings in the Trial Court

A.  Preliminary Proceedings

Petitioner was charged in Shasta County with two murders and a related vehicle theft.  A special circumstance of double murder was alleged.  Petitioner entered pleas of not guilty and not guilty by reason of insanity, and two psychologists were court appointed to evaluated petitioner under Cal. Penal Code § 1026.  The case proceeded to trial.

////

1

1              B.  The Evidence Presented at Trial (Guilt Phase)

2          The jury heard evidence of the following facts.[1]  In January 2016, petitioner's wife, M.,

3   was living in a duplex in Anderson with her sister, daughter, nephew, and Helsby, who moved

4   into the unit prior to M.'s family.  Helsby initially allowed M.'s sister and nephew to move into

5   one of the unit's bedrooms.  About a week before the murders, he also allowed M. and her six-

6   year-old daughter to move into a second bedroom.  M. and her sister were friends with the tenant

7   of the duplex's other unit, C., who introduced them to Helsby before he let them move in.

8   Helsby's girlfriend, Engelhaupt, did not live there, but periodically came over and spent the night.

9   She did not like that Helsby allowed so many people to move in with him.

10         Petitioner came over to visit M. a few times during the time she lived with Helsby.

11  Petitioner's relationship with M. was "rocky" and they "argu[ed] constantly."  One such argument

12  occurred on the night of the murders.  When petitioner came over to visit M. that evening, Helsby

13  was cooking soup in the kitchen.  C. and his girlfriend, N., were also at the residence.  At some

14  point, Helsby pulled a pair of women's underwear out of his pocket and smelled them in front of

15  petitioner.  The underwear belonged to M., who had done her laundry that day.  Helsby's conduct

16  angered petitioner.  As M. described in her testimony, petitioner's face "went . . . bright red" and

17  he clenched both fists.  The record does not reveal whether any words were exchanged between

18  petitioner and Helsby at that point, but N. testified she heard defendant and M. arguing loudly

19  outside and described petitioner's part of the exchange: "He's talking about he's going to kill

20  everybody."  Petitioner denied making any threats, but acknowledged in his testimony that his

21  anger at Helsby's conduct was intensified by the methamphetamine he had ingested a few hours

22  earlier.

23         After this incident, C. and N. gave M. and her daughter a ride to a friend's house.

24  Petitioner joined them for a portion of the ride, but he got out at a convenience store after he and

25  M. continued to argue in the car.  At some point during the next two or three hours, petitioner

26  ////

27  ─────────────────────
[1]  This summary is adapted from the opinion of the California Court of Appeal.  Lodged Doc. 12

28  at 3-8 (ECF No. 27-12 at 4-9).  The undersigned finds it to be accurate.

returned to the duplex and killed both Helsby and Engelhaupt, who apparently had come over in the meantime.  The bodies were discovered later that afternoon.

In a statement to interrogating officers after his arrest and in his trial testimony, petitioner provided the following explanation(s) of what had happened.  Petitioner told the police that he "was fed up with [M.] bein' disrespected," so he returned to the duplex.  When he walked inside without knocking, he found Helsby and Engelhaupt asleep on opposite sides of the couch in the living room.  Petitioner reached over the back of the couch and grabbed Helsby by the throat, initially "plannin' on just chokin' him out."  Helsby woke up, "but he couldn't do nothing."  After petitioner had been choking Helsby for a few minutes, Engelhaupt woke up and grabbed her cell phone.  Petitioner "couldn't have her doin' that," so he let go of Helsby, came up behind Engelhaupt, and used his arm to choke her "until her body went limp."  Helsby was lying on the couch "gasp[ing] for air" while petitioner choked Engelhaupt, but eventually started to get up, so petitioner grabbed a wine bottle that was nearby and "hit him over the head, um, twice."  The second blow caused the wine bottle to shatter and sent Helsby's blood onto petitioner's shirt.  Petitioner then picked up a butter knife from the nearby kitchen counter and stabbed Helsby twice in the chest before walking over to Engelhaupt and also stabbing her in the chest with the knife.

Petitioner claimed he "just snapped," but also explained that when Engelhaupt "got up, went to try to use her phone," that was when he realized he "had to take them both out."  Petitioner also told the officers he stabbed the victims because choking them was taking too long and he "had to make sure" they were dead.  When asked to be more specific about the disrespect he felt the victims had shown M., petitioner responded that Engelhaupt "disrespected" M. by telling Helsby to kick her and her daughter out of the duplex and "into the cold," adding: "And that - that's bullshit. That's a little girl."  With respect to Helsby, petitioner claimed "he has, uh, broken into their bedrooms, uh, took all their stuff, throwed them, um, outside into the mud.  Um, he's, uh, blocked them out of the apartment, you know?  He - he's basically, um - he's tried to put them out, you know?"

During petitioner's testimony at trial, he repeated the claim that Helsby threw M.'s family's belongings "out in the rain" and that Engelhaupt told Helsby to do so.  However, he also

3

described two additional incidents involving Helsby, neither of which he told the interrogating officers.  First, he claimed M. told him that Helsby had come into her room at night and M. "woke up with him standing over the top of [her and her daughter] and watching them while they were sleeping."  The second incident involved Helsby smelling M.'s underwear, described above.

Petitioner testified that he was named after Saint Anthony and "was raised to be a family protector."  Although M.'s daughter, K., was not his biological daughter, she was three years old when petitioner came into her life and he considered her to be his daughter, adding: "Before her father passed away, I made a vow to him . . . that I would watch out after [K.] as my own biological daughter."  Petitioner testified to various "learning disabilities" he had while he was in school and continuing "all the way up until now."  He also testified to having suffered physical and sexual abuse as a child and claimed Helsby's conduct brought back memories of the latter abuse.  Petitioner claimed he ingested methamphetamine about four hours before killing Helsby and Engelhaupt and stated he "was still under the influence" when he did so.  After he saw Helsby smell M.'s underwear that night, he was "very angered" and this anger was intensified by the methamphetamine.

Turning to the murders, petitioner testified he went to the duplex that night not to kill anyone, but only to "physically check [Helsby], slap him around a few times," for disrespecting M. and her daughter.  When asked whether something happened to cause petitioner to "elevate the attack," petitioner answered:

> Yes.  As -- when I first got there, you know, I saw them asleep.  I was just going to choke Helsby out.  However, it was taking a long time.  And by that, he ended up flailing his arms and just moving them sporadically.  [¶]  And by him doing so, he had his -- [Engelhaupt's] feet and had woken her up.  So by him waking her up, I had to act as if he was choking so no -- no cops would be called.  And then -- then she went to call the off -- officers, I had asked her to get me [Helsby's] heart medicine, okay?  And when he -- and when she went to grab the medicine and she got close enough to give some to [Helsby], that's when I -- I had to strangle -- not strangle her, 'cuz I honestly wasn't trying to kill her, but I -- I did end up choking her out.  [¶]  And then I knew that she already saw my face, so it has gone too far.  And so as I had [Engelhaupt], I -- the -- where I was standing was against the back of the couch.  And the couch is a corner couch that was pushed up against the kitchen counter.  And on the corner of the counter was a butter knife.  It wasn't plan – planted there by me or nothing like that.  The apartment was kind of dirty.  And it was

4

just there.  [¶] So as -- as -- as I was strangling [Engelhaupt], I saw Helsby stirring.  And I couldn't have him getting up and getting to the phone, so I grabbed the bottle that was right there on the counter as well, which was an old wine bottle-type, one of the thick bottles, and I had hit him rapidly twice over the head, which it had shattered on the second time and he fell.  [¶] The -- then I -- this was taking so long.  There was already bloodshed, so I had to just hurry up and finish the situation.  And that's when I picked up the butter knife, [Engelhaupt] was already passed out.  So I plunged the butter knife into [Helsby's] chest . . . . And then I did -- I -- I had to repeat the same action, regrettably, on [Engelhaupt].

After killing both victims, petitioner took Engelhaupt's car and went to pick up M. and her daughter from where C. had dropped them off earlier in the night.  M. described petitioner's demeanor as "kind of down, but kind of hyper."  Petitioner told her, "Let's go, we got to go now."  M. said she wanted to go to her father's house and asked whose car he was driving.  Petitioner said it was "his homegirl's car" and told M.: "Well when we get to your dad's house, don't warn anybody, but we're going to go on a road trip."  Petitioner also told M. that "he took care of what he had to do over at Mike's."

They arrived at M.'s father's house early the next morning.  Her father also asked petitioner where he got the car.  Petitioner again said the car belonged to his "homegirl."  He then poured himself some coffee and went outside, saying, "he was going to clean the car out," returning a short time later to burn some papers in the fireplace.  Later that morning, petitioner told M.'s father the car was actually "hot."  M.'s father asked petitioner to remove the car from his property.  Petitioner did so, and returned on foot one or two hours later.  A short time after that, defendant asked M.'s father for a ride and was dropped off at the fairgrounds.

Petitioner's account of strangling and stabbing Helsby and Engelhaupt was confirmed by the physical evidence and testimony from the forensic pathologist who examined the victims' bodies.  The murder weapon was never found; petitioner said "he put it down a storm drain."  Petitioner also admitted he took the victims' cell phones, said he threw them into a field, and helped an investigating officer draw a map of where he did so.  One of the cell phones was found at the designated location; the other was found in a box at the location where petitioner was arrested.

////

5

C. Outcome

The jury found petitioner guilty of two counts of first degree murder and one count of unauthorized taking or driving a vehicle. The jury also found a multiple-murder special circumstance allegation attached to both murder counts to be true.

D. The Sanity Phase

Petitioner waived a jury on the issue of sanity. At the sanity phase, petitioner testified as follows.[2] Petitioner had a history of suicide attempts: he once drank insecticide, once tried to jump off a bridge, and another time tried to walk into oncoming traffic. After discharge from prison a little over a week before the homicides, he had stopped taking his mood-stabilizing medications. The day before the offenses, petitioner visited the Hope Van and got his medications reinstated, but it was unclear whether he had taken them. He was scheduled for mental health treatment the following Friday.

Petitioner used meth prior to the incident. He did not want to sleep because he thought people were chasing him. He was under a lot of stress and "snapped."

In jail following the homicides, petitioner was seen by Dr. Saunders on six occasions. Before the sixth interview, petitioner attempted suicide by hanging. He was taken to the hospital and revived.

On cross-examination petitioner acknowledged that he tried to conceal or destroy evidence implicating him in the homicides. He acknowledged that he killed Engelhaupt because she was a witness.

The prosecution presented testimony from the two court-appointed psychologists, Dr. Saunders and Dr. Caruso. Their testimony is summarized below in relation to petitioner's ineffective assistance of counsel claim.

The court found that petitioner had not carried his burden of proving insanity.

////

////

_____

[2] This summary of petitioner's sanity phase testimony, which the undersigned finds accurate, is adapted from petitioner's Opening Brief on Appeal, Lodged Doc. 6 (ECF No. 27-6).

1      E.   Sentencing

2      Petitioner was sentenced to state prison to serve two consecutive terms of life without the

3   possibility of parole plus a consecutive determinate term of three years.

4   II.      Post-Conviction Proceedings

5      Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of

6   conviction on October 19, 2020.  Lodged Doc. 12 (ECF No. 27-12).  The California Supreme

7   Court denied review on January 13, 2021.  Lodged Doc. 14 (ECF No. 27-14).

8      Petitioner no petitions for collateral relief in the state courts.

9          STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

10     28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

11  1996 ("AEDPA"), provides in relevant part as follows:

12          (d) An application for a writ of habeas corpus on behalf of a person
            in custody pursuant to the judgment of a state court shall not be
13          granted with respect to any claim that was adjudicated on the merits
            in State court proceedings unless the adjudication of the claim –
14

15          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
16          determined by the Supreme Court of the United States; or

17          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
18          State court proceeding.

19     The statute applies whenever the state court has denied a federal claim on its merits,

20  whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

21  (2011).  State court rejection of a federal claim will be presumed to have been on the merits

22  absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed,

23  489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

24  decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

25  may be overcome when there is reason to think some other explanation for the state court's

26  decision is more likely."  Id. at 99-100.

27     The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

28  principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

7

U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

DISCUSSION

I.      Claim One: Ineffective Assistance of Counsel

A.      Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that trial counsel rendered ineffective assistance by failing to present the testimony of Dr. Kent Caruso and Dr. Mark Saunders to negate the *mens rea* element of first degree murder.  He claims that the psychological evidence presented at the sanity phase, if

8

presented at the guilt phase, would have reduced the offense to either manslaughter or second

degree murder on a heat of passion or provocation theory.  At the sanity phase, the witnesses

testified for the prosecution as follows.[3]

Dr. Caruso was appointed by the court to evaluate petitioner.  During a three-hour

interview conducted at the jail, Dr. Caruso noted petitioner's thinking "was at times overly

simplistic and a bit concrete," but "otherwise adequately clear, lucid, linear."  Petitioner's

communication ability indicated "he was not a highly efficient processor of information."  These

observations were consistent with petitioner's score on an IQ test administered by the doctor:

"The result indicated that probably, at best, low average, innate verbal intelligence, with some

verbal skills at elementary school levels, some educational levels, at third, fourth grade.  Some

verbal intellectual problem solving, bordering on mild mental retardation."  The doctor also noted

petitioner's educational and work history indicated "there may have been some developmental

problems or other problems related to brain injury due to early onset substance abuse."

Dr. Caruso also that testified petitioner exhibited paranoid and persecutory thinking,

explaining: "[H]e was a very suspicious individual.  He had persecutory thoughts, tended to see

things, events, various circumstances outside himself as being to blame for his problems."  The

doctor explained the "overall picture" of petitioner's mental health was a "very complex picture

because of his childhood background of abuse and neglect, severe abuse and neglect," including

"significant depravations," and "[t]he possibility of brain injury due to ingestion of drugs from

marijuana at an early age to methamphetamine, LSD."  Dr. Caruso added this likely brain damage

would have "negatively impacted, his mind, his ability to problem solve, whether it was back in

school during his teens or currently, even though, he was eventually able to get his GED at the

jail."

Dr. Caruso diagnosed petitioner as having antisocial personality disorder with chronic

depression, for which he was prescribed an antidepressant, as well as posttraumatic stress

disorder, all of which were "exacerbated by the chronic substance abuse, and, primarily, the

---

[3]  This summary is adapted from the opinion of the California Court of Appeal.  Lodged Doc. 12 at 8-10 (ECF No. 27-12 at 9-11).  The undersigned finds it to be accurate.

methamphetamine." However, nothing in Dr. Caruso's findings indicated petitioner was unable to appreciate the wrongfulness of his conduct.

Dr. Saunders testified that he interviewed petitioner over six sessions, administered various psychological examinations, also interviewed other individuals who knew petitioner, and reviewed various documents, such as police reports and mental health records. Petitioner "indicated that he had a long mental health history that dated back from the time he was a child. He indicated a history of severe emotional, physical, and sexual abuse." Petitioner also told the doctor he began drinking alcohol as a child and progressed to LSD, PCP, and methamphetamine during his teenage years. Petitioner's prison records indicated he was diagnosed with an unspecified mood disorder, polysubstance abuse, and posttraumatic stress disorder. Unlike Dr. Caruso, Dr. Saunders found petitioner's intellectual ability to be within "a normal range of intellectual functioning."

Dr. Saunders diagnosed petitioner with substance abuse disorder, stimulant induced psychotic disorder, and posttraumatic stress disorder. The doctor opined petitioner's crimes were "consistent with a lifetime of reacting, sometimes violently, to perceptions of -- about being disrespected or his family being disrespected," but were "not consistent [with] being in some way guided by psychotic beliefs or behaviors."

B.   The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 692, 694 (1984). Prejudice means that the error actually had an adverse effect on the defense. There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 693-94. In conducting the prejudice determination, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id. at 695. The court need not address both prongs of the Strickland test if the petitioner's showing is insufficient as to one prong. Id. at 697. "If it is ////

10

1    easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which

2    we expect will often be so, that course should be followed." Id.

3              C.  The State Court's Ruling

4         This claim was raised on direct appeal.  Because the California Supreme Court denied

5    discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

6    decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

7    501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

8         The California Court of Appeal ruled in pertinent part as follows:

9              Defendant argues the foregoing psychological testimony, although it
10             "did not support an insanity defense, would have supported the
               subjective element of a defense of provocation and heat of passion,"
11             and "[t]he guilt phase jury should have known that [defendant] was
               subject to compounding mental disorders, in order to determine the
12             presence of the necessary mental states for first degree murder."
               Defendant also notes the trial court specifically ruled "both sides may
13             offer evidence of mental illness upon a proper foundation as to the
               issue of whether or not the Defendant actually formed a required
14             specific intent, premeditated, deliberated, or harbored malice
               aforethought," and argues his trial counsel was constitutionally
15             ineffective for failing to adduce this evidence during the guilt phase
               of the trial.

16             A criminal defendant has the right to the assistance of counsel under
               both the Sixth Amendment to the United States Constitution and
17             article I, section 15, of the California Constitution. (People v.
               Ledesma (1987) 43 Cal.3d 171, 215.) This right "entitles the
18             defendant not to some bare assistance but rather to effective
               assistance. [Citations.] Specifically, it entitles him [or her] to 'the
19             reasonably competent assistance of an attorney acting as his [or her]
               diligent conscientious advocate.' [Citations.]" (Ibid.) The burden of
20             proving a claim of ineffective assistance of counsel is squarely upon
               the defendant. (People v. Camden (1976) 16 Cal.3d 808, 816.) " 'In
21             order to demonstrate ineffective assistance of counsel, a defendant
               must first show counsel's performance was "deficient" because his
22             [or her] "representation fell below an objective standard of
               reasonableness . . . under prevailing professional norms." [Citations.]
23             Second, he [or she] must also show prejudice flowing from counsel's
               performance or lack thereof. [Citation.] Prejudice is shown when
24             there is a "reasonable probability that, but for counsel's
               unprofessional errors, the result of the proceeding would have been
25             different. A reasonable probability is a probability sufficient to
               undermine confidence in the outcome." ' " (In re Harris (1993) 5
26             Cal.4th 813, 832-833; Strickland v. Washington (1984) 466 U.S. 668,
               687 [80 L.Ed.2d 674, 693].)

27

28             We need not determine whether defense counsel's failure to present
               psychological testimony on the issues of provocation and heat of

passion fell below an objective standard of reasonableness because there is no reasonable probability of a more favorable outcome had counsel obtained admission of the evidence. In assessing prejudice under the reasonable probability standard, "the court 'may consider . . . whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak,' that there is no reasonable probability the jury would have decided differently . . . ." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1495 [applying the standard for prejudice in *People v. Watson* (1956) 46 Cal.2d 818]; *see also People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [The standard for prejudice applied in reviewing error under Watson is essentially the same standard for prejudice applied to the test for ineffective assistance of counsel].)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a.).)2 Such malice "may be express or implied." (§ 188.) Express malice "requires an intent to kill that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a "willful, deliberate, and premeditated killing." (§ 189, subd. (a.).) "All other kinds of murders are of the second degree." (Id., subd. (b).)

"Manslaughter is a lesser included offense of murder. . . . Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, [i.e., express or implied malice,] a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted.)

Moreover, "if the provocation is insufficient to reduce a murder to manslaughter, it may nevertheless reduce the murder from first to second degree." (*People v. Wright, supra*, 242 Cal.App.4th at p. 1494.) "Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of both premeditation and malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an

unlawful killing perpetrated with malice aforethought but without premeditation and deliberation." (*People v. Thomas* (1945) 25 Cal.2d 880, 903.)

The evidence supporting the jury's conclusion defendant murdered Helsby and Engelhaupt both with malice aforethought and with premeditation and deliberation was very strong. In arguing the strength of such evidence, the Attorney General relies on *People v. Anderson* (1968) 70 Cal.2d 15, in which our Supreme Court noted three types of evidence typically provide support to a murder conviction based on premeditation and deliberation, i.e., planning activity, motive, and manner of killing. "[T]o sustain a verdict of premeditated and deliberate murder, [Anderson] required (1) extremely strong evidence of planning, (2) evidence of motive in conjunction with evidence of planning or of a calculated manner of killing, or (3) evidence of all three indicia of premeditation and deliberation." (*People v. Memro* (1995) 11 Cal.4th 786, 863; see Anderson, at pp. 26- 27.) However, in *People v. Perez* (1992) 2 Cal.4th 1117, our Supreme Court cautioned that "Anderson did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation." (Id. at p. 1125.) Since *Perez*, the court has cautioned on multiple occasions " '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; *see also People v. Hovarter* (2008) 44 Cal.4th 983, 1019.)

Here, defendant's statement to police and trial testimony, corroborated by the physical evidence and testimony from other witnesses, established both motive and a calculated manner of killing. Defendant admitted to the interrogating officers, and to the jury at trial, that he killed Helsby and Engelhaupt because they disrespected M. and her daughter. Helsby disrespected M. by smelling her underwear a few hours before defendant killed him. Defendant also believed Helsby had entered M. and her daughter's bedroom at night on at least one occasion and stood over them watching them sleep. Defendant further believed Helsby and Engelhaupt disrespected M. and her daughter by seeking to kick them out of Helsby's residence. While defendant claimed he went over to the duplex only to "physically check [Helsby], slap him around a few times," the jury could reasonably have concluded defendant possessed a strong motive to kill both Helsby and Engelhaupt.

Defendant also admitted to killing the victims in a calculated manner. He began by strangling Helsby, switched to strangling Engelhaupt when she woke up and tried to call for help, hit Helsby over the head with a wine bottle when he began to recover from the aborted

strangulation, and then stabbed both victims in the chest with a butter knife. Defendant resorted to stabbing the victims because, as he candidly admitted, "this was taking so long" and he "had to just hurry up and finish the situation." He stabbed Helsby twice, and believed he stabbed Engelhaupt twice (although she was actually stabbed only once), because he "had to make sure" they were dead. Thus, in addition to the calculated manner of killing, defendant admitted engaging in the required calculation. Even if the jury believed he initially intended to "check" Helsby, that intent changed during the

extended period of time the murders took to complete. By the time defendant stabbed both Helsby and Engelhaupt with the butter knife, he made a cold and calculated decision to kill.

Compared to the strong evidence defendant committed two first degree murders, the psychological evidence admitted during the sanity phase of the trial did not support a finding of provocation sufficient to reduce these murders to voluntary manslaughter, and only marginally supported a reduction to second degree murder.

Beginning with heat of passion voluntary manslaughter, even if we assume such evidence tended in reason to make it more likely defendant "actually, subjectively, kill[ed the victims] under the heat of passion," as our Supreme Court explained in *People v. Steele* (2002) 27 Cal.4th 1230, " 'this heat of passion must be such a passion as would naturally be aroused in the mind of *an ordinarily reasonable person* under the given facts and circumstances,' because 'no defendant may set up his [or her] own standard of conduct and justify or excuse himself [or herself] because in fact his [or her] passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of *the ordinarily reasonable [person].*' [Citation.]" (*Id.* at pp. 1252-1253, italics added.) In that case, the court went on to explain that although evidence of the defendant's intoxication coupled with "various mental deficiencies" and "psychological dysfunction due to traumatic experiences . . . may have satisfied the subjective element of heat of passion," such evidence "does not satisfy the objective, reasonable person requirement, which requires provocation by the victim. [Citation.] 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." ' [Citation.] '[E]vidence of defendant's extraordinary character and environmental deficiencies was manifestly irrelevant to the inquiry.' [Citation.]" (*Id.* at p. 1253.)

Here, there was no evidence Engelhaupt provoked defendant at all, let alone to an extent sufficient to cause a reasonable person to act rashly and without reflection. Helsby, on the other hand, did provoke defendant by smelling M.'s underwear in front of him in the kitchen the night of the murder. However, that happened two or three hours before defendant returned to the residence and killed him. Even assuming this conduct would have supported mitigation to voluntary manslaughter had defendant killed Helsby immediately in response to the provocation, we conclude no reasonable person would have remained sufficiently inflamed after such an extended period of time

14

1
2
3

to mitigate Helsby's murder to voluntary manslaughter. Thus, even had the jury been informed of defendant's mental disability and other psychological diagnoses, there was no basis to convict defendant of voluntary manslaughter under a heat of passion theory.

4
5
6
7
8
9
10
11
12

Turning to second degree murder, "a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he [or she] was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.) Again, we conclude no reasonable jury would have concluded Engelhaupt provoked defendant at all. Moreover, even if the jury were to have concluded, based on the psychological testimony defendant wishes had been admitted in the guilt phase of the trial, that defendant began his assault on Helsby due to Helsby's earlier provocation, defendant's own testimony and prior statement to police candidly admitted he stabbed both Helsby and Engelhaupt, not because of the provocation, but because strangling them was taking too long. In addition, the evidence also establishes that defendant killed Engelhaupt to eliminate a witness to his assault on Helsby.

13
14

We conclude there is no reasonable probability of a different outcome had the jury heard the psychological testimony admitted during the sanity phase of the trial.

15   Lodged Doc. 12 at 10-17 (ECF No. 7-12 at 11-18).

16   D. Objective Reasonableness Under § 2254(d)

17   The state court conducted the analysis that Strickland requires, and resolved this claim

18   exclusively on the prejudice prong as Strickland permits.  Relief is therefore available under

19   AEDPA only if the state court's prejudice analysis was objectively unreasonable.  See Frantz, 533

20   F.3d at 738.

21   Although trial counsel might have chosen to pursue a mental state defense other than

22   insanity in this case, the California Court of Appeal reasonably concluded that there is no

23   reasonable probability such a strategy would have avoided petitioner's first degree murder

24   convictions.  This court need not belabor the point that petitioner's own statements provided a

25   basis for the jury to conclude he had premeditated within the expansive meaning of the California

26   statute.  A provocation or heat of passion defense would have contradicted petitioner's statements

27   to police in a way that would have deepened his testimonial credibility problems.

28   ////

15

Furthermore, the psychological expert testimony did not reasonably support heat of passion or provocation.  Dr. Saunders testified that petitioner's crimes were "consistent with a lifetime of reacting, sometimes violently, to perceptions of -- about being disrespected or his family being disrespected," but mere volatility arising from mental disease or defect does not reduce first degree murder to second degree murder or manslaughter.  When Dr. Saunders' opinion is considered together with petitioner's own statements and the timing of events, particularly the time lag between any disrespectful conduct by Helsby and the fatal assaults, the totality of the evidence supports a conclusion of retaliatory violence rather than a response to immediate provocation.

Dr. Caruso testified that petitioner was likely brain damaged, suffered from PTSD, and experienced paranoid and persecutory thinking.  Like Dr. Saunders' testimony, this opinion can be reconciled with the jury's verdicts and does not create the likelihood of a different result.  Both expert opinions provide a basis for understanding how petitioner's mental impairments may have contributed to his crimes, but they do not support a likely reduction of the degree of the homicides.  At most, as the court of appeal noted, petitioner's mentally disordered but authentic subjective experience of provocation might explain his initial choking of Helsby.  In light of the evidence as a whole, however, no reasonable jury is likely to have extended that rationale to petitioner's assault on Engelhaupt or to the stabbing of either victim.

In any event, the court of appeal's conclusion as to prejudice cannot be considered objectively unreasonable.  The outcome reached by the state court here is within the range of Strickland prejudice findings in the Ninth Circuit's caselaw regarding the failure to present mental health evidence as to guilt.  See, e.g., Sandgathe v. Maass, 314 F.3d 371, 381-83 (9th Cir. 2002) (no Strickland violation for failure to investigate a mental health defense where evidence of intermittent explosive disorder would not support an insanity defense under Oregon law); Franklin v. Johnson, 290 F.3d 1223, 1237 (9th Cir. 2002) (no prejudice under Strickland where evidence of mental defect or disease was insufficient to show petitioner lacked the ability to appreciate criminality of his conduct or capacity to form specific intent); Ben-Shalom v. Ayers, 674 F.3d at 1095, 1100-1102 (9th Cir. 2012) (no prejudice under Strickland where psychiatrists'

opinion did not address actual intent and petitioner's confession articulated a premeditated motive for crimes).  Accordingly, relief is unavailable.

II.    Claim Two: Exclusion of Petitioner's Testimony About His "Mental Retardation"

A.    Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that the trial court violated his federal constitutional right to present a defense by excluding his own testimony about the nature of his mental disability.[4]  The background to this claim is as follows.[5]

The prosecution moved in limine to preclude petitioner from testifying to having a mental disability or other mental health diagnosis, arguing that such testimony would amount to inadmissible hearsay, would lack foundation, and would lack relevance "unless and until an expert could then relate how that is probative of any issue in this case."  Prior to petitioner's testimony, after the trial court informed counsel that "both sides may offer evidence of mental illness upon a proper foundation as to the issue of whether or not the Defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought," the prosecution asked whether this ruling would allow petitioner to "get up there and tell the jury he's mentally retarded."  The trial court responded: "That's assuming a proper foundation and basis for that opinion.  And I'm not sure the comment that you just made or the example you just gave me would satisfy that requirement.  But I'm saying, certainly, it is proper to offer evidence that goes to whether or not the Defendant actually formed specific intent, premeditation, deliberation, and so forth."

The prosecutor then objected to the proffer, arguing that petitioner would either be "relying on something an expert would have told him in the past, which is hearsay," or providing a diagnosis of himself without the requisite qualifications to offer such an expert opinion.  The

---

[4]  See Appellant's Opening Brief, Lodged Doc. 6 at 41 (ECF No. 27-6 at 42) (citing Chambers v. Mississippi, 410 U.S. 284 (1973)); Petition for Review, Lodged Doc. 13 at 20 (ECF No. 27-13 at 21) (same).  The federal petition does not reproduce the appellate argument or expressly allege federal constitutional error, but petitioner is clearly attempting to reassert in this court the issues he raised on appeal.  See ECF No. 1 at 4.
[5]  This summary is adapted from the opinion of the California Court of Appeal.  Lodged Doc. 12 at 17-19 (ECF No. 27-12 at 18-20).  The undersigned finds it to be accurate.

trial court agreed defendant could not offer a diagnosis, but indicated "an individual may testify as to particular symptoms or behaviors that that individual personally perceived." The prosecutor then clarified his position that while petitioner could testify that he struggled in school, he should not be allowed to testify to having a diagnosed mental disability. The trial court agreed, stating, "that is the line I'm drawing." Defense counsel then argued petitioner should be allowed to testify: ". . . I am mentally disabled. I have a speech impediment. I have learning disabilities. I don't process things the way other people process things." Counsel argued such testimony would not be expert testimony of a specific diagnosis, but instead "would be sort of a lay opinion." The trial court indicated its belief that some of the examples given by defense counsel crossed the line into expert testimony, but reserved ruling until it was able to "take them on a question-by-question basis."

During petitioner's testimony, defense counsel asked whether he had a speech impediment. When petitioner answered that he did, counsel asked whether he knew the reason why. Petitioner answered: "Yes. I was -- am I allowed to say it? I was born mentally retarded and --" At that point the prosecutor objected on grounds of relevance and foundation. The trial court sustained the objection on the latter ground. Defense counsel then asked whether petitioner had had a speech impediment for as long as he could remember. Petitioner answered: "Yes, sir. I went through therapy all through my childhood ages -- all the way up until now. I'm still going through therapy. I have trouble comprehending. I have trouble --" Defense counsel then interrupted to ask whether petitioner had "learning difficulties in school" and "what were those?" Petitioner answered that he did and explained: "Due to the fact that I was slow and I had these learning disabilities, I was placed in what we call -- or the school system calls SED, which stands for seriously emotionally disturbed. And I went through these classes all through to my senior year." When counsel asked what "being slow" meant to petitioner, he answered: "Being slow -- well, for a prime example, which would be just second nature to you -- like, for example, knowing your times tables. I, myself, do not know my times tables, and still have to use paper and all that stuff so I can be able to add or subtract times tables."

////

18

B. The Clearly Established Federal Law

The Constitution guarantees criminal defendants the right to present a defense. Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Crane v. Kentucky, 476 U.S. 683, 690 (1986). A defendant's right to present evidence may be limited to accommodate other legitimate interests in the criminal trial process. Chambers, 410 U.S. at 295. State rules limiting the admissibility of defense evidence are constitutionally permissible as long as they are rationally related to the legitimate purpose of excluding evidence that has only a weak logical connection to the central issues at trial. Holmes v. South Carolina, 547 U.S. 319, 326-330 (2006).

C. The State Court's Ruling

The California Court of Appeal ruled in pertinent part as follows:

> Evidence Code section 800 provides: "If a witness is not testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his [or her] testimony." This provision "merely requires that [lay] witnesses express themselves at the lowest possible level of abstraction. [Citation.] Whenever feasible 'concluding' should be left to the jury; however, when the details observed . . . are 'too complex or too subtle' for concrete description by the witness, he [or she] may state his [or her] general impression." (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127; *see also People v. Melton* (1988) 44 Cal.3d 713, 744 [lay witness permitted to express an opinion based on his or her perception "where the concrete observations on which the opinion is based cannot otherwise be conveyed"].)
>
> In arguing the trial court abused its discretion by excluding defendant's opinion that he was "born mentally retarded," defendant relies primarily on *People v. McAlpin* (1991) 53 Cal.3d 1289, a child sexual abuse case in which our Supreme Court held two of the defendant's character witnesses could offer lay opinion testimony, based on their personal observations of the defendant's conduct with their daughters, that the defendant was "not a person given to lewd conduct with children." (*Id*. at p. 1309.) Similar opinion testimony from a third character witness, however, was properly excluded because it "was not based on personal observation of defendant's 'conduct with children.' " (*Id*. at pp. 1308-1309.)
>
> Here, defendant certainly possessed personal knowledge of his own intellectual functioning. However, the trial court did not sustain an objection to defendant's opinion he was mentally impaired based on improper lay opinion. Instead, the trial court sustained an objection to defendant's statement he was "born mentally retarded" on "foundation" grounds. It is not clear how defendant knew he was born with a cognitive impairment, as opposed to having developed a

learning disability due to other factors, such as trauma caused by physical abuse or drug and alcohol use as a child. Nor is it at all apparent how one would come to have personal knowledge of being born with a cognitive impairment. For these reasons, we cannot conclude the trial court abused its discretion in sustaining the prosecution's objection on foundation grounds. Inquiry was not shut down. The trial court merely required defense counsel to lay a foundation for defendant's personal knowledge of his cognitive impairment. Thereafter, counsel elicited defendant's opinion that he suffered from learning disabilities and the basis for such an opinion. The trial court did not abuse its discretion in so ruling. Nor was defendant "denied his right to present a defense."

### D.  Objective Reasonableness Under § 2254(d)

The California Court of Appeal analyzed this issue as a matter of evidence, which is governed by state law and not subject to review here.  See Estelle v. McGuire, 502 U.S. 62, 67 (1992).  To the extent the state court summarily rejected the claim that petitioner's constitutional right to present a defense was impaired, the question for this court is whether that conclusion necessarily involved an unreasonable application of U.S. Supreme Court precedent.  See Richter, 562 U.S. at 102.  It did not.

Petitioner was permitted to testify to his own experience of being mentally "slow" and the ways this limitation has affected his life.  There was no wholesale prohibition of a defense theory based on petitioner's cognitive capacity as it might go to specific intent.  Rather, the trial court stated that any evidence offered on the matter would be subject to the usual rules of evidence, including foundation requirements.  Petitioner has identified no U.S. Supreme Court precedent providing that correct application of such rules to a defendant's own testimony violates the right to present a defense.[6]

To the contrary, it is clearly established that defense evidence may be excluded on grounds including marginal relevance and lack of reliability.  See Holmes, 547 U.S. at 326-327; see also United States v. Scheffer, 410 U.S. 303, 309 (1998) (upholding constitutionality of ban on polygraph evidence).  Here, the excluded testimony—that petitioner's limitations had been labeled "mental retardation" and had been present from birth—added little if anything of

---

[6]  This court is bound by the state appellate court's determination that there was no error in application of the California rules of evidence.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

probative value to petitioner's testimony about his own functioning.  And state law rules regarding the necessary foundation for testimony and those limiting hearsay, both of which were at issue regarding petitioner's so-called "lay opinion" as to his own diagnosis, go directly to reliability.  Accordingly, they are among those "familiar and unquestionably constitutional" evidentiary rules that may be used to exclude even relevant defense evidence.  Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (plurality opinion).

Because the state court's disposition of this claim did not involve an objectively unreasonable application of clearly established federal law, habeas relief is unavailable.

III.     Claim Three: Sentencing Error

Petitioner alleges that his restitution fine must be eliminated because he lacks the ability to pay.  Federal habeas relief is available only for violations of federal rights.  28 U.S.C. § 2254(a).  Errors of state law do not come within the scope of federal habeas jurisdiction, and sentencing is a quintessentially state law matter that is not reviewable in federal habeas.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (habeas relief "is unavailable for alleged error in the interpretation or application of state law"); Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (question of state sentencing law are not cognizable in federal habeas).  Claim Three therefore provides no grounds for relief.

CONCLUSION

For all the reasons explained above, the state courts' denial of Claims One and Two was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d), and Claim Three does not present a cognizable claim.   Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to

1  which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed

2  within fourteen days after service of the objections.  The parties are advised that failure to file

3  objections within the specified time may waive the right to appeal the District Court's order.

4  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  DATED: August 22, 2023

6

7  ALLISON CLAIRE
   UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28